UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**TRACY HACK,**

    Plaintiff,

vs.                                                                  Case No: 20-cv-
                                                                  Hon.
                                                                  Mag.

**TENET HEALTHCARE CORPORATION, INC.**,
**VHS OF MICHIGAN, INC.**, and
**VHS HARPER-HUTZEL HOSPITAL**, **INC.**,

    Defendants.
_____

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500 /fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff **Tracy Hack,** by her attorneys **Deborah Gordon Law**, complains against Defendants as follows:

1

## Jurisdiction and Parties

1. This is an action for retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and disability discrimination in violation the of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1202(1).

2. Plaintiff's claims arise out of Defendants' actions in failing to provide Plaintiff with a reasonable accommodation for her disability after she returned from medical leave and failing to return her to her position as a Patient Safety Officer in violation of the FMLA.

3. Plaintiff Tracy Hack is a resident of Michigan and resides in the Eastern District.

4. Defendant TENET HEALTHCARE CORPORATION, INC., ("Tenet") is a foreign for-profit corporation, incorporated in Nevada and headquartered in Dallas, Texas. It is a multi-national, investor-owned healthcare services company. Tenet does business, and has numerous subsidiaries it operates and controls, in the State of Michigan.

5. VHS OF MICHIGAN, INC., a wholly-owned subsidiary of VHS, Inc., is a foreign for-profit corporation, incorporated in Delaware and doing business in Detroit, Michigan as The Detroit Medical Center ("DMC"), a Michigan corporation with its principal place of business in Wayne County Michigan. In 2013, Tenet

purchased VHS of Michigan.

6. VHS HARPER-HUTZEL HOSPITAL, INC., a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan as Harper-Hutzel Hospital (comprising Harper University Hospital, Hutzel Women's Hospital, the CardioVascular Institute and DMC Surgery Hospital). In 2013, VHS HARPER-HUTZEL HOSPITAL, INC. became a subsidiary owned by Tenet.

7. The events underlying this Complaint occurred in the Eastern District of Michigan.

8. This Court has federal subject matter jurisdiction pursuant to 28 USC §1331 and 28 USC § 1343.

## Background Facts

### a. Employment History

9. Plaintiff is diagnosed with Lupus, Anemia, Fibromyalgia, and Low Count Monoclonal B-Cell Lymphocytosis. She has always managed these conditions and they have never prevented her from performing her work and maintaining a successful career.

10. Plaintiff began working for the DMC as the Regional Director of Risk Management and Patient Safety on January 9, 2017. Her salary was $115,000, plus 10% bonus eligibility. Plaintiff was promoted to National Director of Quality and

Patient Safety on January 12, 2018. Her salary was increased to $170,000, plus 20% bonus eligibility. Plaintiff was promoted to Chief Quality Officer in May of 2019 with salary and bonus options remaining the same.

11. She was a member of the DMC executive team and reported directly to Anthony Tedeschi, then CEO of the DMC.

12. Her performance was at all times satisfactory or better.

13. In September of 2019, Defendants unexpectedly terminated four employees that worked closely with Plaintiff in her Chief of Quality role. Plaintiff had reason to believe her job was also in jeopardy.

14. Rather than await termination, Plaintiff reached out to Dr. Tedeschi to discuss moving into a different role—Patient Safety Officer ("PSO")— within the DMC network. Dr. Tedeschi told Plaintiff that it would be in her best interest to take the PSO position. Her role as Chief of Quality was later cut; Plaintiff was not given a reason why.

15. Shortly thereafter, Plaintiff was slotted into the PSO role. In doing so, she took a pay cut of roughly $16,000.

### b. Plaintiff's Medical Leave

16. Plaintiff was to begin the PSO role on December 22, 2019 but had been covering the PSO role since it had been vacated in November of 2019.

17. Plaintiff was using Manager Time Off (MTO) and was working from

home during the holiday season from December 20, 2019, to January 6, 2020.

18. Plaintiff's job could at all times be performed remotely.

19. On December 18, 2019, Plaintiff began experiencing serious medical symptoms that were exacerbating her health conditions and visited her primary care physician. Laboratory results were suggestive of declining hemoglobin.

20. Plaintiff made an appointment with her hematologist for December 30, 2019 related to her laboratory results and worsening symptoms, but because of such a quick deterioration in her medical condition, Plaintiff presented to the emergency room at Huron Valley-Sinai Hospital on December 27, 2019. Plaintiff was found to have a significantly low hemoglobin and was transfused 2 units of packed red blood cells while in the emergency room, underwent an emergency procedure, and was admitted for observation. She notified Joe Eastman, Chief Human Resources Officer, Karima Bentounsi, Chief Operating Officer, and Anthony Tedeschi, DMC CEO.

21. Plaintiff began experiencing painful complications immediately following the procedure, including severe back and leg pain. She visited her hematologist on January 6, 2020, who told Plaintiff that despite the 2 units of blood that she received, she would also require an iron infusion.

22. Given her current pain level, health conditions, and impending iron infusions, Plaintiff's hematologist determined she would not be able to return to the

Hospital on January 7, 2020.

23. Accordingly, on January 7, 2020, Plaintiff requested and submitted FMLA paperwork to Jeffrey Edralin, Tenet Leave of Absence Administrator, who approved her leave. She also notified her supervisors and the HR Officer of her leave.

24. On January 10, 2020, Plaintiff had an iron infusion. Unfortunately, Plaintiff had an allergic reaction to the intravenous (IV) iron that was administered and was transferred via ambulance to St. John Emergency Room and was admitted to observation unit and was discharged on January 12, 2020. Thereafter, her back and leg pain became unbearable.

25. She again notified her supervisors and the HR officer of her health status.

26. On January 17, 2020, she returned to the cancer center infusion clinic for IV hydration to flush her kidneys related to a suspected delayed blood transfusion reaction.

27. On January 27, 2020, Plaintiff underwent a magnetic resonance imaging (MRI) with contrast and she suffered an adverse reaction and was again sent to St. John Hospital Emergency Room where she was admitted for observation and pain control. She was discharged from the hospital on January 28, 2020.

28. Plaintiff was then referred to Rheumatology who diagnosed her with

Fibromyalgia and confirmed an exacerbation of her Lupus and started her on immunosuppressive medications and steroids.

29. Plaintiff was also referred to a Pain Specialist/Physical Medicine and Rehabilitation Physician who prescribed physical therapy 3 days a week. Plaintiff was only able to attend 2 sessions before the quarantine and was told by Rheumatology that it was no longer safe for her to attend.

### c. Discussions Regarding Plaintiff's Return to Work

30. During this time, the COVID-19 pandemic hit. Michigan Governor Gretchen Whitmer declared a state of emergency on March 10, 2020.

31. Plaintiff's health conditions made her particularly susceptible to complications from COVID-19, as she was severely immunocompromised. Defendants were aware of this, as Plaintiff sent physician notes to HR, Maher, and the Tenet Leave of Absence Administrator each time she had an appointment. Because Plaintiff worked at a hospital, her risk of exposure to the virus was high.

32. Throughout her leave, Plaintiff regularly communicated with Maher and Eastman about her status. They told her not to be concerned about the end of her FMLA leave, which was set to expire on March 31, 2020, and reassured Plaintiff her job was not in jeopardy. Tenet's Leave of Absence Administrator also approved of Plaintiff's continued leave while she needed it.

33. Moreover, the Governor had issued an Executive Order, effective from

March 24, 2020- April 13, 2020, which required employees to work from home unless those employees were designated as essential workers. *See* Executive Order 2020-21. Plaintiff was not a designated essential worker.

34. In May of 2020, while Plaintiff was out on leave, she suggested to Maher that she begin to ease back in to a regular working schedule, starting with working three days per week, from home, and taking the other two days off to rest. Maher was supportive of this arrangement. (At this time, the Governor's Order still required all but essential works to remain at home. *See* Executive Order 2020-59.)

35. On May 29, 2020, Plaintiff was cleared by her doctor to begin working again for three days out of the week, from home. Plaintiff sent the notice to Maher, Eastman, and the Tenet Leave of Absence Operations Administrator who signs off on all returning employees. (At this time, the Governor's Order still required all but essential works to remain at home. *See* Executive Order 2020-96.)

36. Although Defendants were originally encouraging of this arrangement, they declined to approve Plaintiff to return to work for three days remotely. Weeks went by and Plaintiff was not approved to return.

37. Plaintiff was cleared by her physician to begin working full-time from home on July 6, 2020. She informed Defendants that same day.

### d. **Failure to Accommodate**

38. On July 6, 2020, Plaintiff got a call from Eastman. He told her that the

8

DMC was not going to allow Plaintiff's accommodation of working remotely.

39. She would have to be physically present in the office full time or would not be able to remain in her role. (At this time, the Governor's Order stated that every employee that could work remotely must do so. *See* Executive Order 2020-110.)

40. This accommodation would not have been an undue burden for Defendants because Plaintiff could perform her job remotely.

41. Plaintiff suggested that she physically return to the Hospital, but remain in her own office, which would limit her travel throughout the Hospital and thereby limit her exposure to the virus. Eastman declined this option and told Plaintiff that the DMC would not be allowing Plaintiff <u>any</u> accommodations.

42. On July 8, 2020, Plaintiff sent a letter to Maher, Eastman, and Karima Bentounsi, then Chief Operating Officer of Harper Hospital, asking them to reconsider the decision and made reference to FMLA retaliation and the Americans with Disabilities Act.

43. Defendants did not reconsider their failure to accommodate. Instead, on July 21, 2020, Plaintiff was offered a position as an Abstractor, a role in which she would review medical charts to ensure compliance with Medicare and Medicaid. Her supervisors approved of her working remotely in this role, which paid significantly less money.

44. Left with no other choice, Plaintiff accepted the role as an Abstractor,

and began working remotely on August 3, 2020.

45. Plaintiff is now making $94,692 with fewer benefits and no bonus eligibility. This is roughly $60,000 less than her role as a PSO, not including bonuses. In addition, Plaintiff is grossly over-qualified for this role.

## **COUNT I**
### *Retaliation in Violation of the Family Medical Leave Act*

46. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

47. Defendants are employers covered by the FMLA pursuant to 29 U.S.C. § 2601 *et seq.*; 29 USC § 2611.

48. Plaintiff was entitled to leave under the FMLA, and was qualified to enjoy its protections as set forth above.

49. Defendants engaged in prohibited conduct under the FMLA by retaliating against Plaintiff for invoking protections of the Act.

50. Namely, as described above, Defendants approved Plaintiff for FMLA leave, but demoted her to a position where she made significantly less upon her return to work.

51. Defendants' actions were intentional, with deliberate disregard for the rights and sensibilities of the Plaintiff.

52. As a direct and proximate result of Defendants' wrongdoing, Plaintiff has sustained loss of earnings and earning capacity, past and future lost earnings, the value of fringe and retirement benefits, loss of job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, loss of the enjoyment of the ordinary pleasures of life.

## COUNT II
*Violations of the Michigan's Persons with Disabilities Civil Rights Act*

53. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

54. Plaintiff is a disabled person within the meaning of the PWDCRA because she actually and currently has, a record of, or is regarded as having a physical impairment that substantially limits one or more major life activities.

55. Defendants are a covered entity under the PWDCRA, pursuant to MCL 37.1201(b).

56. Defendants knew of Plaintiff's disability and/or perceived Plaintiff as disabled.

57. Plaintiff was qualified to perform the essential functions of her job with reasonable accommodation.

58. Plaintiff suggested several reasonable accommodations, such as continuing to work from home, a hybrid schedule of coming into the Hospital and

working from home, or physically showing up to the Hospital but remaining in her personal office so as to limit her exposure to COVID-19. Defendants refused to accommodate Plaintiff, even though accommodating Plaintiff would not have been an undue burden.

59. Defendants also retaliated against Plaintiff in violation of the PWDCRA.

60. Plaintiff engaged in activities protected by the Act, when she requested a reasonable accommodation for her disability.

61. Defendants nonetheless took a materially adverse action against Plaintiff by demoting her because she requested a reasonable accommodation.

62. As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained injuries and damages including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of fringe benefits, mental anguish, physical and emotional distress, humiliation and embarrassment, loss of professional reputation, and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice.

63. Defendants violated the PWDCRA by discriminating and retaliating against Plaintiff by interfering with her right to receive benefits and demoting her because of a disability that was unrelated to her ability to perform the job, and/or because she was regarded as having a disability.

64. Defendants' actions were intentional, with deliberate disregard for the rights and sensibilities of the Plaintiff.

## **Relief Requested**

Plaintiff demands judgment against Defendants as follows:

A. Legal Relief:

1. Compensatory damages in whatever amount she is found to be entitled;

2. Exemplary damages in whatever amount she is found to be entitled;

3. Punitive damages in whatever amount she is found to be entitled; and

4. An award of interest, costs, reasonable attorney fees, and expert witness fees.

B. Equitable Relief:

1. An injunction from this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

2. An order from this Court placing Plaintiff in the position she would have been in had there been no wrongdoing by Defendant, including reinstatement with back pay;

3. Declaratory relief stating that Defendants discriminated against Plaintiff in violation of federal and state law;

4. An award of front pay;

5. An award of interest, costs and reasonable attorney fees; and

6. Whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  October 27, 2020     **DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

## JURY DEMAND

Plaintiff Tracy Hack, by and through her attorneys Deborah Gordon Law, demands a trial by jury of all the issues in this cause.

Dated:  October 27, 2020     **DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com